Good morning, and may it please the Court. My name is Dwayne Robinson, and I represent military veterans who are seeking medical monitoring for harms caused by the defendant's manufacturing and sale of methylene. I'm joined here today by one of those veterans, Sergeant Patrick Wager, who is with me there on the front row. I respectfully request three minutes for rebuttal. This Court should reverse the trial court's dismissal of my client's claims. As to the three issues that we have raised in this appeal, our friends on the other side have conceded that the district court had errored at least two of those claims. First, the notion that the FDA's approval of a drug somehow insulates the drug from any sort of liability under the political question doctrine as to the FDA. They've conceded that the district court got that wrong. We think this is the only court in the nation that's ever found that way. We would respectfully request the Court to reverse that decision. They also recognize that the district court erred in characterizing the Genentech entities as generic manufacturers. That's not what we list in our complaint. They recognize that's wrong. Therefore, the Supreme Court's messing decision simply does not preclude liability as to that. The remaining issue in this case, at least for us, we understand that there is an issue about standing and some other collateral issues they've raised. But the last issue for us is jurisdiction. And here, we did meet our burden to show that the Court had jurisdiction over the Roche entities. At the very least, it was— Can you go to the Article III standing issue first before you get to the personal jurisdiction? Absolutely. So our friends on either side raised two arguments as to standing. One argument is that they believe because other jurisdictions outside of California have recognized that you cannot bring a medical monitoring claim where a victim has already suffered the harm itself. You are precluded from seeking medical monitoring. There's a couple of problems with that. Number one, this is a diversity case. And the California—it's a diversity case. And the California Supreme Court sets the rules on the grounds of medical monitoring. And in the Potter v. Fonda— I agree with that, certainly. But here, this is not really a standing issue in terms of what you have to allege to prove a claim. Standing is a very modest burden, which this Court has recognized in the Brown case. Okay? They've recognized this injury in fact. They've recognized that there is traceability. What they're really arguing is, is it really redressable? And here, it is redressable. And there's a very simple reason why it's redressable. By our clients getting medical monitoring, they will then be able to get the diagnosis for mefloquine toxicity. By that diagnosis alone, that means that they are no longer going to be taking drugs for PTSD, for other ailments that are actually probably making their symptoms much worse. So— I thought you alleged that they already have experienced that toxicity then, already? We've alleged that they've experienced symptoms associated with mefloquine toxicity. But none of them have actually been diagnosed with mefloquine toxicity. And that's what we're seeking. But you'll be proving that diagnosis as part of the liability case. Is that the right— Well, what we would prove as part of the liability case is a number of things, depending on the type of claims that we have. We would be proving, number one, that they were subject to toxic exposure. Okay? Number two, that this is something that is not common, that the regular public would not experience these symptoms but for this action. And the other element that the Supreme Court of California requires in medical monitoring claims is that we also establish that they will benefit from that medical monitoring. All of that is subject to expert reports and discovery. This is not a question that's at the— Can I ask you— Go ahead. Go ahead. Please. Well, the question, I guess, comes into, are you seeking perspective? I mean, medical monitoring is not to rectify harm that's been done. It's to discover harm that hasn't yet been discovered. But that seems very inconsistent. I mean, maybe you would have a plaintiff that didn't have this, you know, was exposed but didn't have the medical diagnosis yet, but that doesn't seem to be your plaintiff's. Well, respectfully, Your Honor, I don't think that that's how the Supreme Court of California characterized medical monitoring in the Potter case. And I would really direct the court and its clerks to that case because what the court looked at is they said, listen, medical monitoring is just a remedy. It's just a different form of remedy. Indeed, it's an equitable remedy. But really, this is like any other tort case where, yes, we will have to go and establish that, yes, we were harmed, that we were injured, and that, yes, that this remedy will be related to curing our harm. We have to meet all those elements. But that case is not before us. We are simply here on very threshold issues, two of which our friends on the other side has conceded. And I will say this. There are now four decisions that have addressed these types of claims, the Poole case, the Montesano case, the Sheets case, and then our case below. And here, the district court agreed that there was standing. If this court disagreed and thought there's a standing issue, we should at least be allowed the right to replead. This is not something that can be decided right here on the pleadings. What we hear a lot from our friends on the other side — Well, but standing isn't — I mean, what, you want to be able to recast your complaint and file — I mean, you asked for a certification of a class for medical monitoring. That was it. Correct. So the question is, does that provide standing here? Well, our claim definitely provides standing, Your Honor. The California Supreme Court has recognized that medical monitoring is a valid cause of action. Mr. Robinson, can I ask you to — this is a little bit unusual here because you're going first on an issue as to which the defendants disagreed with the district judge. Right. The district judge said your pleading and standing was sufficient. And the defendants are arguing your key allegations — if I recall correctly, it was roughly paragraphs 88 to 92 or 93 of your complaint — are too speculative, not specific enough, too conclusory, the kinds of language we hear a lot in pleading debates. If we were to agree with them on that point, are there ways in which you could amend those allegations to make them more specific? Well, that's what we're saying, yes. I think there would be ways if you're asking me for a specific —  if you're asking me today for specific allegations as to what our experts may opine, I cannot give that here from the lectern. That's not in the record on appeal. And that's the point that I'm trying to make is that, number one, the record here is sufficient to support standing. But if the court — I'm asking you to assume we might disagree with you on that. I heard you, Your Honor. And what I'm saying is I personally don't have that information in terms of what our experts would put in the record in order to bolster those allegations. Keep in mind, this is — we're here on a Rule 8 situation. This Court has said that burden is modest. We're not required to submit an extra report to — to — to bust just our claim at the pleading stage. And, Your Honor — I know. But nobody really knows what Twombly and Iqbal really require, right? They're not applied consistently across the board. And that's why it's so important for courts to allow amendment when — when allegations are treated as insufficient. Your Honor — So I'm asking how you might be able to amend if there's a problem. Yes. And, Your Honor, the record is silent on that, and I don't have anything in addition to add to the record. And precisely because — Well, so let me ask precisely, though. If your clients get diagnosed with this toxicity, then you're saying that there's a different type of treatment for them. Absolutely, Your Honor. And so what is that different type of treatment? So there's a number of things we've outlined in our complaint. Let me give you two examples. So number one, there's different testing that can be done when you have methylcontoxicity than if you have some other type of symptom. Testing for what? So for us — I'm going to go to that, Your Honor, right now. Magnetic resonance imaging, for instance. That's one thing that can be done. This is a powerful, non-invasive medical imaging technique, which basically takes images of the human body. And the reason why they do this is because they want to ensure that the experience, the central nervous symptoms that you're experiencing, it's not due to tumors or other physical ailments. It's actually due to — But that's the monitoring part, right? That's the what? Isn't that determined to diagnose? Correct, Your Honor. But the whole point of monitoring is that then once you're diagnosed with something, something different is going to happen. So what's the difference that's going to happen? Sure. So what's going to happen then is that there's different sort of neuropsychology, neuro-ophthalmology sort of, I guess, training — not training, but treatment that you get that's different than if you sort of had, like, PTSD or multiple sclerosis. And again, all that is laid out — Because as I understand the complaint, it just — it seems like the treatment is therapy in both cases. Well, and again, I think that that's how our friends in the psych try to characterize — Right. And so that's why I'm trying to get you to tell me why that's wrong. Yeah. Well, why it's wrong is just a difference of factual allegations. In other words, we're saying that this treatment will actually help our people because that's what our experts are telling our side of it. What they're saying — But we don't know what that difference is yet. Yeah. And that's why we have Discovery, Your Honor. And that's — and that's why — and so it's not to be used as this — But it has to be speculative. It's completely speculative at this point whether or not the treatment would be different. Well, no, it's not speculative because we do allege that. We do allege that it's different. What they're saying is, we disagree that it's different. You can't just say it's different and then not back it up. You have to have something to back it up. And we did, Your Honor. In our complaint, and I'm happy to go there and go through the allegations, we do identify that it's not just simple therapy. It's neurologists, for instance, neuro-ophthalmology therapists. That's different than your general practitioners, who so far have been the only ones to look at and analyze our client's symptoms. So again — Well, I thought it's just that they disbelieve that this toxicity has happened. So that's why they haven't treated. Yes. Yes. But again, what you've heard, part of the argument that you would agree that they have said is that, well, the doctors already looked at them, and there's no issue, and they're not doing well. But what we're saying is, well, yes, because they haven't been diagnosed with the right materials yet. And once you get that diagnosis, then you can have treatment that's designated and that's detailed as to this issue. And again, the district court said we met our burden. If you disagree, the proper thing to do is to allow us the opportunity to at least make those allegations. If I can turn briefly to general jurisdiction with the time that I have left, because what we've heard from our friends on the other side is that we didn't meet our burden, and we did. If I can go through those allegations very, very quickly. For general jurisdiction or for specific jurisdiction? For general jurisdiction, yes. So I want to start with Roche Labs. We agree with our friends on the other side that the operative date is March 1st, 2023. We have in the record a May 2nd, 2022, annual report from Roche Labs that shows the majority of their officers and directors operating out of California. Again, what the Supreme Court has said, the nerve center is what really matters here. Now, what you sort of put in your filings that matters is where's the nerve center for operations. We then have a status report that we ourselves downloaded on May 9th, 2023. That's about three months or so, two or three months after Clayton was filed. And there it showed the same orientation of officers and directors. It's not until June of 2023 that we then have a filing that was submitted from our friends on the other side that shows the change now. Where magically, after three different federal judges in the Northern District of California had found that they were subject to general jurisdiction in California, they're magically now back in California. Focusing on Roche, Roche, Inc., if we can, the district court respectfully ignored the well-put allegations as to general jurisdiction as to Roche, Inc. And if I can give you a few examples, the Roche website, up until the filing of our complaint, reported that Genentech's South San Francisco campus serves as a headquarters for that May 2023 report, I thought it reflects information from May 2022. It was a status report that you basically download to see, okay, what's the current status of those entities? And that was the status as of that point. So yes, that reflects that the information had not changed between July 2022 and May 2023. If they had, Your Honor, if I may, for instance, if they had decided to switch all their people and move them to Nutley, New Jersey, they would have filed something interim, but they didn't do that. They only switched it over in June of- So in May 2023, you're saying that this information is accurate as of May 2023? Correct. That's when we downloaded the information. And at the very least, Your Honor, that's a factual question that allows us to go back and be heard on the merits. If I can go back to Roche, Inc. So here we've identified multiple admissions by- I want to go back to this idea that that's a factual allegation. I mean, you're talking about personal jurisdiction. I guess the real question is, should the district court allow limited discovery on the personal jurisdiction question? because I don't think you get by personal jurisdiction just based on dueling allegations. I think you have to come up with evidence, don't you? Your Honor, and we said that in our brief, and we're thankful that you agree with us. Yes, at the very least, the district court should have had an evidentiary hearing. The district court should not have resolved factual disputes about general jurisdiction on its own at the motion to dismiss stage. So you're correct. As to both entities, there were definite disputes of fact. If I can just say one other quick point before I address the other issues in the case. As to the Roche, Inc. entity, we had multiple admissions from Roche through their websites, their press releases, their SEC filings, that all reported that after the 2009 merger with the Genentech entities, that all of the Roche entities were being housed in San Francisco. They submitted a declaration of Mr. Resnick. And on appeal, what they've said is, Mr. Resnick's declaration, this somehow negates everything in our allegations. But it doesn't, and here's what Judge Bumate. Nowhere in that declaration does he say, hey, we had plans to relocate to San Francisco, but we decided not to do it. He doesn't say, by the way, when the website refers to Roche, it's referring to some other Roche entities and not Roche that's a part of this case. The declaration, it says two relevant things that are important here. It says, number one, that the minutes that were prepared, that they were remotely done, and remotely done in New Jersey. Remote minutes does not establish where general jurisdiction is. They make a second point that says the primary activity now of Roche, Inc. is now licensing other patents. And they said that our officers, officers, sat and performed in New Jersey in March 2023. They say- Can I ask a question? If we were to disagree with you on the personal jurisdiction question about the Roche defendants, would that knock out the case, or would that leave the Genentech defendants left, or? It would leave the Genentech defendants left, Your Honor, but hopefully you don't disagree with us on the general jurisdiction issue. I'm just asking questions. Because keep in mind, in Mr. Resnick's declaration, he says nothing at all about the directors of the entities. He doesn't at all refute the allegations that are in our complaint. But I guess- Let me just ask one other question, then. If, can you just proceed on your claims on Genentech alone, the defendants alone? We could, Your Honor, but our concern is that there may not be complete relief for our clients and the class. And all these issues about, okay, which defendant should be liable, who can be subject to a judgment, these are all matters that can and will be ironed out later on in the case in discovery. All we're asking here is for our clients to have the opportunity to go forward with their case. If we can address the political question issue as to the military. Okay, I see Judge Wimpton doesn't think we need to do that, so I'll move on unless there are other questions. I thought you kind of, did you want her to save five minutes, but? I wanted to reserve three minutes. Oh, sorry. So maybe what I will say here, one of the things our friends on the other side is trying to get this court to do is to adopt a very broad federal preemptive ruling that would apply to name brand drug manufacturers, and the court should not do that. First of all, there's the Levine case from the Supreme Court that obviously precludes this court from finding there's preemption as to failure to warn claims as far as name brand manufacturers. And I strongly encourage the court to look at the concurring opinion of Justice Thomas in that decision. Justice Thomas was a part of the majority of Levine, and then he also wrote the messing decision. And in there, he identifies some key language that I think is very important for the court to consider if my friends on the other side want to argue about preemption. Justice Thomas wrote the following. Initial approval of a label amounts to a finding by the FDA that a label is safe for purposes of getting federal approval to market the drug. It does not represent a finding that the drugs, as labeled, could never be deemed unsafe by later federal action or, as in this case, the application of state law. As the Levine court makes very clear, through the statutory language in the Food and Drug Cosmetic Act, Congress did not intend to abrogate state law that plays a critical role in overseeing and policing when drugs harm people. Here- Which case was that that you're recording Justice Thomas from?  Levine, yes. But the Supreme Court has- The concurring opinion. I guess I need to go back and look at that because I'm worried that your statement is a little bit too overbroad. because the Supreme Court has clearly said there are cases where you're preempted, state claims are preempted once the FDA approves it. And your honor, see I'm running into my rebuttal time to answer your question and save my time. So you're right, your honor. And what the Supreme Court said in the Messing case, in the Bartlett case, is that as it pertains to generic manufacturers, there is preemption. Because generic manufacturers, and again, this is a very important part here, generic manufacturers have to comply with the labels of the name brand drug manufacturers. And that's where the district court made the huge error here. The district court thought because the entity's name is Genentech, they must be generic manufacturers. And therefore, Messing and Bartlett apply. But everybody, I mean, even the non-generic companies have to comply with the label. I don't understand that distinction. Well, that's the distinction the Supreme Court itself has drawn, your honor. If we look at Levine, the court has made it clear that as to a name brand manufacturer, they actually play a critical role in the labeling. They submit to the FDA proposals as to how to label it. There's also- But that seems different. So this is only about your design defect claim? No. Well, there's both. We have design defect and we have failure to warn claim. Yeah, I know. But I don't understand. Your argument might apply to design defect. I don't understand how it applies to failure to warn. Because failure to warn is what the Supreme Court has said. We tell you what you have to say. No, no, your honor. No, Wyeth drew the distinction and was upheld in that in Mensing, but with the changes being affected regulation, correct? Correct, your honor. Correct, Justice. And the NDA holder has that power and that obligation under certain circumstances that state law can recognize, right? Correct, and if I could just add one quick thing. In Justice Thomas' concurrence in Wyeth v. Levine, he goes through and he catalogs the federal regulations that show that even after the drug is approved by the FDA, there are distinct reporting requirements where the drug manufacturer has to tell the FDA, are people having adverse effects? Are there things going on? So the simple approval by the FDA does not somehow insulate these drug manufacturers from liability, nor should that be the rule simply because it's the military that buys these products. If so, that leaves our military men and women in less protection to the general public when they use consumer goods. Okay, we'll give you time for rebuttal, thank you. Thank you so much. Good morning, your honor. May it please the court, David Zients on behalf of the defendants. I'd propose subject to your questions to start with the standing issue that we've been discussing already this morning. I would then like to talk, if the court gets past subject matter jurisdiction, kind of two issues that together dispose of the whole case. One is personal jurisdiction on which the district court was entirely correct. In the second, Judge Bumate, you asked the question, what then happens to the Genentech defendants? The simple answer is the plaintiffs have now disclaimed everything but successor liability for the Genentech defendants. They have not come close to pleading the prerequisites for successor liability, so I'd hope to touch on that as well. To start, though, with standing. So standing, just help my framework here. We're looking at this as a federal issue. I mean, to what degree does the California, do California state court decisions influence or affect our article three standing? I don't think it's really relevant. This is, the question is, is there injury traceability, redressability as a matter of is it a case of controversy under the constitution? I think there is something the Supreme Court said in O'Shea and there can be some shading into between the scope of the remedy that exists and in questions of redressability. Here, I think when you read the Potter decision, I don't actually see the delta between that and what everyone else talks about in terms of medical monitoring. The basic problem here is there's a mismatch. The whole concept of monitoring, it's in the word monitor. You monitor to catch something before it happens. So in the traditional case, if you have exposure to a toxin and that exposure increases your risk, then you might get some benefit to be able to have the polluter funding a regime where you go in and get regular checkups and they catch a cancer that is developing in your system before the symptoms arise. Here, they say we are already injured. And they've sort of pled themselves into a catch-22, and they did it for a reason, by the way. I don't think it's sort of an accident or something that could be fixed with some sort of amendment. That's my question, is shouldn't they be allowed to amend, but I have this lingering question of whether they could. If we agree with this theory, that medical monitoring doesn't work here. So I think there's several standing problems, and at least some of them are not fixable. One of them, in theory, the idea of a better treatment, better clinical treatment, that's the only one of them that's a real pleading issue that in theory is fixable. Though I didn't hear in response to your questions any answer as to how. But that's, I think, you don't even have to get to that issue because there's just a more conceptual problem here. They're basically trying to do this as a class action. To have a class action, you can't have individual issues predominate. And in a normal toxic torque case where you claim you've been injured by the side effects of a drug, you're going to have to prove on an individualized basis that that is actually the cause and it wasn't something else. And you can't do that as a class action. So they try to get around that with this medical monitoring, but it just winds up not fitting. But what, I mean, what about, and I guess you don't remand it for them to add a new plaintiff. But theoretically, they could add a plaintiff who hasn't yet had any symptoms. But I guess your argument would be, it's too late for that, if you do have such a plaintiff, let them bring a new claim. Yeah, your honor, I think- Because that doesn't fit within actually the class that they ask to be certified, right? No, your honor, the claim here is that people already have this condition. I think if there is another plaintiff out there that they want to find to bring a case, we might have a statute of limitations issue. At least, I don't, I have to look at the complaint again, at least it was presented just this morning, though. It seems like they were saying, well, they have the symptoms, but they don't yet have the toxicity, like, diagnosis. Yeah, I think that's the catch-22, that they've let themselves into a box. So if they have, if they have the condition, and there's, you know- Well, is there a difference between symptoms and the condition? Can't they have symptoms but not the condition? And so they're suggesting they could potentially get more symptoms in the future that then crosses a threshold into the diagnosis of, I can never say, the toxicity problem. Sure, well, I think the plaintiffs, I don't think they've pled that, you know, they're worried that they have sort of the precursors to something and then it's going to get worse or this condition will manifest. They, to be honest, I'm not entirely sure because sometimes it changes, but, you know, if their position is we have these symptoms that might be caused by mefloquine, but they also might be caused by something else, like PTSD, and because we're uncertain about that, you know, then we need to get monitored and get a diagnosis. If that's the claim, I think they have the problem that Judge Hamilton was alluding to earlier, which is, you know, part of the claim here is the causation and it's causation and redressability. And it's totally speculative. If they don't want to prove in court that this was a cause because they want to have a class action, they don't actually want to have to go through the process of saying, you know, for this individual plaintiff, I can rule out PTSD. But why is that a causation problem? So, you know, say they were exposed to the toxin. They have some symptoms of this toxicity, but they're worried and it has not been diagnosed yet, but they're worried that it's a progressive problem and they'll get worse, and then at some point they'll cross a threshold into being diagnosed to that disease. So monitoring would help that, correct? Your Honor, I don't understand the allegations to be, you know, they haven't crossed a threshold yet, but they'll be able to catch it before they do. The allegation to me seems to be, you know, sometimes it's, we really think, you know, Plaintiff Kasten in her complaint, this is at paragraph 186, says it is highly likely that her condition is related to her ingestion of mefloquine. You know, if she's right about that, then she's going to be able to prove by a preponderance of the evidence that actually this is what she has. And if this is what she has, it doesn't redress that to get a doctor to say, yes, this is what you have. If, by the way, in a traditional... Well, I could, well, sorry. Is the solution to the problem you're highlighting then just, in essence, a mass tort action of individual claims being brought by people who have been exposed to mefloquine? Yeah, in a traditional, you know, this happens all the time. People who claim they've been injured by the side effects of a drug bring toxic tort actions. In general, these are done on an individualized basis. If there's a lot of them, they might be consolidated in a multi-district litigation. There are people... There are, but in this case, there would be huge statute of limitations problems, correct? It would be a huge. I think that, you know, we raised the statute of limitations issue in our motion to defend... And that's why they're looking for medical monitoring, because they want to say it hasn't arisen yet. I think that is one reason. I think another reason is just to have, you know, a way to get a class action. You know, I don't want to put words into the mouths of plaintiffs. But, you know, there is a sort of artificial construct here. And if I could just finish, you know, I think to Judge Bumate, you're asking, is it really a causation issue? I think even if you can sort of avoid the causation problem by saying, you know, you're just getting the monitoring to sort of clear up the uncertainty about what they have or what they don't have, you then have, you know, a very big, you know, speculation problem. Because if they want to say, no, the reason we don't have this issue of no redressability is we don't actually know. And what we will benefit from is the diagnosis. If that's the allegation, it becomes totally speculative that it is that, rather than, you know, all the conditions that their doctors for the last 20 years have been... But that seems like it could be fixed by repleting, potentially, he claims, so they said. I guess I haven't heard, I didn't hear, I didn't hear what that could be. I didn't see in the brief even a suggestion. You know, we raised, we crossed the field. They had an opportunity to raise this in response. I didn't see some suggestion that because of how this played out in the district court that they really ought to get a chance. I just don't see what the fix would be. To me, it's much more conceptual where they're trying to jam a square peg into a round hole. It's a little early to say it's impossible, however. Sure, Your Honor. I guess... That's my question. I mean, our standard seems to be pretty high. If we agreed with you on this theory, the standard seems to be pretty high to just say, well, they don't get a chance to amend. I mean, they didn't even need to ask to amend below because the district court said there was jurisdiction. So I'm just not sure we can spin out all the hypotheticals. This is, it's not intuitive how this would play out. I mean, you may be right, but I just wonder why we don't let the district court figure that out on remand. I know that's probably not what you want to do on finality, but... In front of an actual amended complaint instead of a hypothetical one. Yeah, I understand that, Your Honor. I think, you know, there's aspects of this that are pleadings. There are aspects of it that the way they've engineered this entire case just lands them in this... No, I'm sensitive to that. I just don't, it does, I mean, that was the question I had, is can they do it? And my gut tells me that if we agreed with this argument, it would be very difficult. But very difficult is different than impossible. Sure, Your Honor. Well, I mean, I guess I'd go, you know, I'd go further and say it's difficult...  I think it's difficult to the point that without the plaintiffs coming here and saying what they would do, it would sort of be a waste of judicial resources. Obviously, normally this plays out in a district court where the district court says, I'm dismissing, well, what do you got? You know, here, obviously, the district court had, in our view, an erroneous view of the standing issue. So I guess the court here would have options about what to do. Maybe this is a good transition to the personal jurisdiction issue because, I mean, just hypothetically, if we agreed with you on the standing and the personal jurisdiction issue, we could decide either one, right? We don't have to decide them both and we don't have to decide them in order. We have, we could decide either one, right? So as to the Roche defendants, that's absolutely correct. Genentech is different because of the successor. The Genentech defendants don't have a personal jurisdiction defense because they are California corporations. Their defense is, we don't belong in this case because we have nothing to do with... So that's a merit. So even if we wanted to go with personal jurisdiction, we would still need to confront the Article III issue with Genentech. I think that's right. And I was really looking for a way to tell the court that, because honestly, personal jurisdiction is quite straightforward and the successor liability issue, there's just nothing there. But, you know, Steele Co. is Steele Co. And I think probably the answer is that you have to get through subject matter jurisdiction in order to get to that one particular issue. Ah, to successor, yeah. But I will say, Your Honor, you know, while, you know, one advantage of standing is that it could, you know, dispose of the whole case if the court... And then I don't think you need to reach anything else. If the court is inclined to say this should have been dismissed for standing, but there should have been an opportunity to replead, you know, given that that would then not be kind of complete relief for at least for any of the defendants, you know, we'd suggest that it would be appropriate to then also, you know, reach and affirm the district court on the personal jurisdiction issue. Even though that would only take care of two of the defendants, not... I mean, you still have to... But the district court did say there was no successor liability, right? The district court... I think the things got a little muddled in the way... It was sort of unclear what the plaintiffs were saying the problem was with Genentech. The district court dismissed Genentech. You know, I think when the district court was talking about generic, we agree that Genentech is not a generic manufacturer. I think what the district court was getting at is this. It's what Judge Hamilton was talking about before. It's the NDA holder is what matters. There's the NDA holder and then there's everyone else. And the Genentech defendants are everyone else. Can we focus on that for just a moment? Because I want to make sure I understand the relationship among the... We have four defendants, right? Two Genentech, two Roche and something. Correct, Your Honor. Are they under common ownership? They are not. There is an ultimate parent that is the same.  But they are not... They don't fall in the same lines. You know, one is to one side and one is to the other. They are under common ownership? Yes, Your Honor. Okay. So help me out. I've been studying and trying to, you know, follow the difference between Levine and Mensing for a number of years now since those cases came out. But I've never before seen a situation in which the NDA holder was a distinct entity from other defendants that are not generic, but are engaged in the business and they're all under common ownership. How do Levine and Wyeth against Levine and Mensing play out in that situation? Sure. I think, Your Honor, the reason you haven't seen a case that looks quite like this is because they've pled two of these four companies have nothing at all to do with this drug. Roche Inc. stopped making larium around 2005, 2006. The transaction that they're talking about that they call a merger happened in 2009. There's no allegation that Genentech ever had anything to do with brand name larium, with generic mefloquine, anything. They have clarified that the only reason that the Genentech defendants are here is they think that they have succeeded to the liabilities of Roche Inc. And so, you know, that's why I think the theory as I understand it that they're pursuing now is that Roche Inc. is the NDA holder, so it can be liable and Genentech has now been assigned those liabilities, which they have not come close to pleading the prerequisites for that. Because Roche Inc. still exists. They concede that it exists as a separate entity. The normal rule for successor liability in any state whose law could apply here is you don't have successor liability when the predecessor exists and you have recourse. Clearly, there's recourse. They are suing the Roche defendants. Did Genentech in the, what, 2007 or so transaction receive assets related to mefloquine from any Roche entities? We are on it. Are you asking as a factual matter or under the complaint? As a factual matter. Well, if they're different, please tell me. You know, I don't think so. As I understand it, all they say in the complaint, what we know is that Roche Inc. got out of the Valerian business, stopped making it voluntarily applied to withdraw its NDA before this 2009 transaction happened where Genentech became fully owned by the ultimate corporate parent. What the plaintiffs, the plaintiffs I think are being a little clever in the complaint where they say that part of the transfer of assets meant that Genentech acquired the capability of continuing on the Larium line of business, but I guess that just means they could if they wanted to. I'm not really sure what that means, but there's no allegation that Genentech ever had anything to do with Larium and I don't think that, I think that is correct, that just they've never had anything to do with it. Let me raise just my, explicitly my concern, it may or may not be applicable to this case, but I'm concerned about some clever corporate lawyering that would, in a case where a drug is causing trouble and is going to be inviting massive liability, we've all seen those cases, where a parent company decides we'll put the NDA in the shell subsidiary and we'll keep our operational, our operations in separate subsidiaries and assets in separate subsidiaries and we'll say you can only, that Levine lets you only reach the one corporate entity that holds the NDA, which would be useless. Right. Would you agree that that would be, that that's not necessarily all insulated under Levine and Mensing? No, I don't think it would be. I think the same rules that preclude this case in terms of corporate relationships and how liabilities pass on, what you're describing would, I think would fall readily into one of these rules for if you set up, if you kind of set up a shell company to have the NDA but to not actually have the ability to pay a judgment, that's what's missing here. If you create a situation where you try to put all the liability into a company that is not able to pay a judgment and then no one has recourse, you know, that's exactly when the rules the plaintiffs want to invoke would come into play. Here, there is absolutely no allegation that that's what happened. You know, as a factual matter, all of this, you know, the idea that Lariam had these liabilities, this is coming up much later, well after the relevant corporate transactions have happened but just on the face of the complaint, they don't allege that the Roche defendants are not capable of satisfying a judgment and they voted with their feet on that. They sued the Roche defendants. So obviously, they think they are separate entities who are capable of satisfying a judgment. Your Honor, I haven't spoken much about personal jurisdiction. So I thought, you know, just very quickly, you know, I think their argument has basically come down to this status report that they describe as the May 9th, 2023 status report. You know, page 79 of the excerpts of record is a declaration from plaintiff's counsel, one of plaintiff's counsel who says what this is, says, on May 9th, 2023, I purchased the status report for Roche Laboratories. So, you know, it's very clear that what this means is that doesn't mean that on that day, someone in New Jersey called up the Roche defendants and say, hey, is it still right? Can we still report that these are your officers and directors? It's just that's what was in the system as of that date. And when you look at it, page 82 and 83 of the record, it says following are the most recently reported officers and directors. And it says the date of that most recent report. It was May 2nd, 2022. The district court got this absolutely right. And I don't, this is not a factual dispute. This is the plaintiffs, you know, looking at a document and, you know, pretending it says something that it does not and using that, you know, ginned up idea of a factual dispute to controvert, you know, an affidavit. There is clear evidence in the record on an affidavit, totally appropriate on a personal jurisdiction challenge, saying as of March 1st, 2023, all of the officers and directors were located in New Jersey. And there's just nothing at all in that corporate filing that contradicts that in any way. Subject, I see my time is up and absent any other questions, we'd ask you to, you know, vacate the decision on standing and reverse, you know, dismiss for that reason or alternatively to affirm the dismissal. Okay, thank you. Thank you, Your Honor. We'll give three minutes for rebuttal. Your Honors, I know I just have three minutes. I'll try to briefly address the questions you asked. So our friends at your side did concede that it's not impossible for us to replead this and I think that's determinative. You asked about, well, what is it in the complaint that shows that this is addressable? Again, paragraph 90, we refer to therapy, the specified therapy in this context. Now, what our friends are saying is, oh, therapy, that's not enough. That's a factual issue. The question is whether or not we plead that there's a basis. We also, in addition, in paragraph 91, refer to physical rehabilitation to address neurological symptoms that can be more especially tailored when you have a methadone toxicity diagnosis than when you don't. Again, what they're contesting is, hey, we don't think this stuff is gonna work, therefore, your client should not have their day in court. That's not the rule. I think, Judge Nelson, you were having a lot of questions about, well, what does this case really look like? Let me go back to Potter, because really, Potter is what defines what is a medical monitoring case and these are the element. You have to show there's significant exposure to a hazardous substance and the extent of the exposure. Here, they were taking weekly pills that were interrupting the central nervous system of these military veterans. The toxicity of the chemicals. At the time that this drug was going for approval, they were telling the FDA that it's rare that anyone would have any suicide ideation, any sort of post-traumatic stress or other types of symptoms associated with methadone toxicity. What we now know is that more than half of the people that take this drug will have these symptoms. The third element, is there an increased risk of disease? In other words, is it different than in the general public? And then also, the clinical value of early detection. All these things are things that we will prove and we can establish and I hear my friends now talking about class action. Why won't it work as a class action? Why are we talking about class actions? They're doing that because they know we have met our burden. We've met our burden under Ickley and Tombley. We've met our burden under Section 8. So, sorry, just go back to your first point. You said paragraph 90 is the one that talks about the actual treatment. So it just says the therapeutic treatment for that toxicity will be, is differ substantially from therapeutic treatments provided to individuals with PTSD. So if we gave you the opportunity to amend, you could say how that's substantially different, right? I would assume. Yes, if the court felt that that was necessary, of course, we would do that. Yes, Your Honor, yes. I'm just telling you, sitting here today, I personally don't know. I'm not a doctor. I can't testify as to that. I have 40 seconds left, so I will try to go through the rest of this. Can I just ask you real quickly, and we'll give you some more time if you need it. Potter, you said it was an equitable, medical monitoring was an equitable remedy in Potter. Well, California courts have described medical monitoring as an equitable remedy. That's correct. But not damages. They haven't described them as damages. Well, I think the way that Potter sort of analogized the remedy to damages to sort of say, hey, this is why we think it should be allowed because it's no different than if you were injured and you wanted to have money to pay for your medical bills. They looked at it in terms of, okay. Well, I think it's totally different. That's the problem because medical monitoring is not to compensate you for damages you've already had. I mean, we're running around in circles here, but. But what I'm saying is, this is how the California Supreme Court analyzed whether they would allow medical monitoring under state law claims. And as the court said. There's no question that medical monitoring is allowed. It's still allowed. Yeah, that's not the question. The question is, what is it? Because if it's damages, then the class action that you've sought doesn't work. That's why I have questions about whether you can actually fix this on remand. And when we come before the court in our class certification, we'll be happy to argue that issue. But we're not here today on class. Okay, go ahead. Yeah, we'll give you another minute. So to quickly go to the rest of the declaration. You didn't hear from my friend on the other side contest anything in what I told you. The things that are missing from the rest of the declaration that calls into question the many admissions from the Roche defendants over many, many years that they're in San Francisco. They didn't talk about pool. They didn't talk about sheets. They didn't talk about Matsano. In addition to that, the Cleveland case is a very important case if this court even wants to go down the realm of successor liability. Because this is a 2012 case, a more recent case by the California Supreme Court. And in that case, the California Supreme Court made it clear there is no per se rule when it comes to successor liability and the idea that you have to have a predecessor that doesn't exist anymore. They said there is no per se rule. It's on a case by case basis. That's not a reason to destroy our case at the pleading stage. Also, the district court did not rule on successor liability at all. That's an alternative gun that they're raising. That's just not. I have to clear up the record on that. That's simply. Well, I don't think they said anything inconsistent with that. I think they agreed it was pretty muddled. Could you address Mr. Zion's point, however, about this May 2023 status report referring back to 2022 information that they say was then stale? So what we downloaded was a status update. In other words, if there were any changes in your annual report, that update would tell you, OK, yes, there's been a new filing that has shown, OK, there's been a change in this date or that date. And I understand that my friend on the other side wants to argue that, well, you should interpret the evidence this way, that it's just because we forgot to update it when we decided to move everyone back to New Jersey. But that's an inference in their favor. What matters at this stage is, number one, is there allegations that are factual in the record? Did they contest them by the rest of the declaration? No. But even besides that, is there other evidence in the record that creates, at the very least, a factual question as to general jurisdiction? And the answer is yes. And for those reasons, this court should reverse. They recognize the trial court got it wrong in multiple respects. The ideal thing here is to send this back down for the trial court to do its work and get this done in the right way. Thank you. Thank you to both counsel for very well-presented arguments that have helped us greatly. The case is now submitted, and we will move on to...
judges: Hamilton, NELSON, BUMATAY